### BEACHAM's Assignees *v.* ECKFORD's Executors.

In copartnership cases, where the written agreement between the parties is doubtful in its terms, their subsequent conduct under it, is admissible in aid of the construction of the instrument and determining the question of intent.

There is no general rule fixing the date of the dissolution of a partnership as the period from which interest is to be computed against the partner who is indebted to his associate.

The allowance or refusal of interest in such cases, depends upon the circumstances of each.

E. in New York and B. in Baltimore, were partners in building a frigate in Baltimore, and subsequently in conducting a ship-yard there.   E. made the advances on building the frigate and received the price; and in 1827, three years before the dissolution, was aware in general terms that in a settlement of their accounts there would be a large balance due to B. but he did not know what such balance was.   There never was any settlement made between the partners.   The accounts were kept at Baltimore, and there were extensive transactions afterwards, so that at the dissolution, in 1830, though E. might have well inferred that he owed B., he had no means of ascertaining what was the true balance.   E. in 1827, applied to B. for an account, which B. promised to send from time to time, but it was never sent.   And E. neglected to furnish his accounts to B. when requested.   E. died in 1832, and there was no accurate statement of the accounts made out until 1837, after a suit was commenced by B.'s assignees against E.'s executors, for a settlement.   Such statement was then made known to the executors; and it thereby appeared that there was a balance of more than $27,000 due from E. to B. in 1830.

*Held,* that both parties had been remiss in their duty; that B. should have furnished his accounts so as to put E. in default; that E.'s executors should not be charged with interest from the date of the dissolution on the balance afterwards found to have been then due from E.; but that they were liable to pay interest from 1837, the date when they were authentically informed of the extent of such balance, because although the suit was then in progress, they might have paid the ascertained amount into court for the benefit of B.'s assignees.

Beacham v. Eckford's Executors.

On the dissolution of a partnership between persons residing at different places, it is the duty of each partner to furnish to the other all their accounts, and to endeavor to adjust them and ascertain the balance ; and when the same is ascertained, the one indebted must pay such balance.

This is especially the duty of the partner at the place where the principal business has been transacted.

Upon the death of a copartner, this duty becomes imperative upon the survivor, and if he neglect it, he will lose interest on the balance which may subsequently appear to have been due to him.

In a suit by the assignees of one partner against the executors of the other, for a settlement of the partnership accounts, it appeared that both parties had been in default ; the accounts were intricate, the questions upon them doubtful, and though a large balance was found due, a portion of the claim equally large, was disallowed. No costs were given to either party.

May 20, 24, 25 ; August 28, 1844.

The bill was filed on the 19th day of September, 1835, by Matthew Kelly and James Frazier as assignees of James Beacham of the city of Baltimore, against the executors of Henry Eckford, formerly of the city of New York, deceased, for an account of certain copartnership dealings between Eckford and Beacham. It appeared that shortly before the 28th of January, 1825, Mr. Eckford who was a very extensive ship-builder in New York, entered into a contract with M. Rebello, the Chargé of the Emperor of Brazil, to build for his government two first class frigates, for which he was to receive $350,000 each. His contract also provided for his being paid in addition, for the fitment and armament of the vessels, in case he was required to and did fit and furnish them for sea.

Mr. Eckford having determined to build one of the frigates in Baltimore, entered into a contract with Beacham, who was a ship-builder at that port, by which it was mutually agreed that they should build the vessel on joint account, Mr. E. making the necessary advances and furnishing the live oak and some other materials. The frigate was built accordingly, and was finished in the summer of 1826. She was called the "Baltimore." On her completion, Mr. Eckford at M. Rebello's request, proceeded and fitted her out for sea, and sent her with a small armament and a complement of officers and men, to Rio Janeiro, and in 1827 he shipped the residue of her armament to Brazil directly from New York. B. aided E. in procuring such of the fitments in

1826, as were furnished in Baltimore, and they were put on board the frigate there under his direction.

Mr. Eckford received the stipulated price for the frigate; and also the payments for the fitment and armament, on which there was a large profit. When the frigate was about to sail it became necessary to give bonds under the Neutrality Act of Congress, which was done by E. and B. with two sureties, in the sum of $600,000, Mr. E. being good for that amount, and Beacham being of comparatively limited means. For this service $12,000 was paid to Eckford.

The partnership in the Baltimore ship-yard continued until November 6, 1830, during which time several other vessels were built, and others repaired.

Mr. Eckford died in November, 1831. Requests for accounts were made on both sides from 1827 onward, but none were furnished so as to exhibit a full statement, and no settlement ever took place. A large balance was claimed by B. to be due to him from the estate of E., which in the bill was alleged to be at least $25,000, and the executors were repeatedly called upon to account and pay, which calls they met by a request for the Baltimore books and accounts. No accurate statement and balance sheet of the partnership transactions was ever made up until June, 1837. The one then made was furnished to the executors, and it exhibited a balance due from Eckford to Beacham at the dissolution, which on the most favorable footing for the executors, exceeded $27,000. They did not pay or offer any sum to the assignees of Beacham, or bring any amount into court for their benefit.

The suit had then been pending nearly two years, and in November, 1839, it was referred to David Codwise, Esq., one of the masters of the court, to take and state the partnership accounts.

On the reference, the complainants claimed that Beacham was equally interested with Eckford in the outfit account of the frigate Baltimore, and in the sum received for bonding her. Also that they were entitled to interest from the date of the dissolution, on the balance ascertained to have been at that time due from Eckford to Beacham. The master allowed all these claims, and in February, 1844, made his report, by which it appeared

that there was due from the estate of Eckford to the complainants $37,879 49 of principal and $35,280 53, of interest; in all $73,160 02. He also reported the balance which would be due on omitting the outfit account and the sum paid for bonding, on which footing there was due of principal $27,494 77, and of interest, $25,608 32, making a total of $53,103 09.

The defendants excepted to the master's report in respect of all the allowances beyond the principal sum of $27,494 77; and the cause came on to be heard on their exceptions, with the pleadings, evidence, and the proceedings and testimony before the master.

The principal part of the argument, and of the judgment of the court, related to the questions affecting Beacham's claim to participate in the outfit and bonding of the frigate. The reporter, believing that this part of the case is not of sufficient interest to warrant its insertion, has omitted the whole of it, with the exception of a single point; and the report is limited to that point and the question of interest.

Some additional facts will be found mentioned in the opinion.

*F. B. Cutting* and *Murray Hoffman*, for the defendants in support of the exceptions.

*J. L. Mason* and *J. Prescott Hall*, for the complainants.

The Assistant Vice-Chancellor, (first examined the exception relating to the profits and commissions on the outfit account of the frigate, and after discussing the question upon the terms of the respective agreements between M. Rebello and Eckford, and between the latter and Beacham, and upon the testimony bearing upon the first agreement, proceeded as follows.)

I have stated that the testimony convinces me that the outfit, and all beyond what was embraced in the contract for $350,000, were in pursuance of a new contract between Eckford and Rebello, or were furnished upon a *quantum meruit*.

Is there any evidence that Beacham was concerned with E. in this transaction?

Such testimony as there is, touching this point, bears also upon the question of intent in the copartnership agreement, as illustrated by the subsequent conduct of the parties. This mode of arriving at the construction, where the instrument itself is doubtful, is well settled in partnership cases. (Story on Part. 287, 288, § 191, 192; Collyer on Part. 112, B. 2, ch. 2, § 2. *Geddes* v. *Wallace*, 2 Bligh's R. 270, 297. And see *Shore* v. *Wilson*, 9 Clark & Fin. 566, per Tindal, Ch. J.; S. C. in 11 Simons, 592, 615 note, and 5 Scott's New R. 958; *Attorney General* v. *Drummond*, 1 Dr. & Warren, 368, per Sugden, Chancellor.)

In support of Beacham's right to participate, the complainants rely upon the fact that he furnished a portion of the outfit from the joint funds at Baltimore; upon the entries in the books of Eckford; and upon the inference that the outfit was an incident to the copartnership business, and there was no motive for B. to engage in it, or justice in E.'s asking him to engage in it, unless he was to be interested in its benefits.

I have already adverted to these inferences, and will observe nothing farther on the subject, except to say that the outfit was not an incident to the building. It was a distinct branch of business, defined as such in Rebello's contract; and he was at liberty to employ any one or more to supply it, and could have it put on board in Baltimore, New York, or elsewhere.

The circumstance that so much of the outfit as was furnished in 1826, was put on board at Baltimore, does not give to it the character of an incident to the building, any more than if it had been put on board in New York. To recur to the facts relied upon.

After the frigate was launched, when by his contract Rebello was to receive her, and Eckford's duty was performed; Rebello employed Eckford to deliver the ship at Rio Janeiro, and to furnish her with the furniture and armament requisite for such a vessel when fully armed. This included of course the victualing and manning the ship for her outward voyage. She was at Baltimore, and it was a needless expense to bring her to New York, to fit her out and send her to sea. It was therefore done at the port of Baltimore. Eckford having a partner there in a ship-yard, and an agent, Hazel, in whom he had confidence, made use of

their aid in fitting out the ship. They were drawing upon him constantly for moneys. And Beacham paid for a large portion of the outfit made in 1826, out of those funds, and by delivering drafts on Eckford directly to the outfitters. I might say that Hazel was as much an actor as Beacham, but B. was the principal there and H. a clerk. Eckford himself procured in New York, and sent to Baltimore, a still larger portion of the outfit.

Now I cannot perceive that these facts establish any agreement for Beacham to share in the outfit. He acted for E., at his request; and by drawing the drafts, chiefly with his means. He may have done this as a gratuity, or he may have expected compensation; but I cannot say that he did it as a partner.

If the right to share rests upon the sole ground that B. transacted a part of it in Baltimore, it must either be limited to the part which he transacted, or else it is a good right to the extent of the whole armament contract with Rebello. If B. were interested in what E. furnished in New York in 1826, why is he not equally interested in what E. furnished on the same contract in 1827? The latter was as much an incident to building the frigate as the former, and they were partners in the ship-yard at Baltimore in 1827. It would seem that the claim for the armament, which was at first asserted on the reference and then withdrawn, was deemed rather too bald by the complainants themselves. Yet it is difficult to see why it is any weaker than the claim for the outfit furnished in 1826, which included a part of the armament.

Next, the evidence derived from Eckford's books. It appears that he opened an account against "Baltimore Frigate," in which he entered indiscriminately, his disbursements for the frame and building, as well as for the outfit, and so much of the armament as went forward in 1826. And it is argued that this was either to exhibit his profit, or by way of an account against Beacham; and in either event, shows that he deemed the building and outfit as one contract and one transaction. Under this account, the profits, as well as the cost price, are entered on many articles bought for the outfit; and it was argued that this fact proves that the account could not have been kept as one against Rebello, or

to show Eckford the whole cost of the frigate; and thus it must have been an account against Beacham.

It is somewhat doubtful with what view the account was kept. It was not an account against Beacham, for two reasons. There is a distinct account against him in the ledger, in which all his drafts are charged to him; and the profits on the outfit are en-tered in the frigate account, which could not be a charge against B., even if the outfit itself were. I give no heed to the suggestion that E. intended this as an account against Beacham, and de-signed to defraud him by these entries. It is absurd to suppose that B. would pass over without discovery, a charge of five cents a pound for shot, entered expressly as *an extra charge* on a bill previously entered, when the five cents extra was double the whole cost of the article. Similar instances might be mentioned. And if I were compelled to believe that Mr. Eckford, whose ledger shows that he was then dealing in building vessels for foreign governments to the amount of millions of dollars, would stoop to so pitiful a fraud on his partner in a sub-contract; I surely discover no evidence in the case to induce me to think that he was so weak and foolish as to place the record of it on the face of his account with that partner.

The ledger discloses a similar account in all respects with the Amazon, the other frigate built for Rebello. And my opinion upon the whole is, that the account against the Baltimore, was designed to furnish at one view, the *data* for an account against Rebello for the extra charges, and for ascertaining the profit on the whole. If as I suppose, the outfit was not furnished under the original contract with Rebello, the great per centage charged on the ball and other articles, was not incorrect. At all events, this account does not aid me in sustaining Beacham's claim to share in the outfit. In that respect it proves nothing for either party.

I now come to some evidence on the other side. Henry Hazel was the accountant who, by the agreement between E. and Beach-am, was to keep the books of the concern in Baltimore, and he kept them from 1825, till 1827 or 1828. When the outfit charges came to be paid, Hazel supposing that they were not within the contract for building the frigate, or within the ship-yard business of Eckford and B., opened a separate account against the frigate

for those charges, and they were all entered in that account from time to time as they were paid. All the charges and expenses for building the frigate he had entered under "Ship Yard" account, and such as were paid in the summer and fall of 1826, after he commenced the separate account, were entered there still. It was perfectly proper, assuming that the outfit was Eckford's alone, to enter it in some form on the books of E. and Beacham; because the payments were made in that concern, and there were no other books in which B. could enter them. Its propriety is also shown by the fact that a small account of money paid by B. for E., and without dispute for E. individually, appeared in the same books.

It is true that Eckford told Hazel to open such separate account against the frigate for outfit, and this was about the time the first disbursements were made for that purpose. This, if it proves anything, proves that E. did not suppose or intend that B. had any interest in the outfit. No separate account was necessary, if this was a co-partnership transaction, for the "Ship Yard" account would exhibit the items just as well as a new one.

The new account thus opened, was in effect therefore, an account against Eckford individually. So it would appear to Beacham, and so Hazel treated it throughout, down to the time that he prepared for the complainants, while testifying in this cause, the book given in evidence as exhibiting the accounts between Eckford and Beacham. This outfit account was thus opened and continued by Beacham's clerk, in his own ship-yard, and under his daily observation, and I cannot doubt, with his knowledge and approbation. How can I resist the conclusion which is forced upon me, that he understood its object, and did not imagine that he had any interest in the outfit?

There is further testimony that leads to the same conclusion, which is to be found in Beacham's letters, relative to a settlement. In one to Eckford, he says, "I am desirous of having the books adjusted, which I cannot do for the want of *your accounts against the yard.*" In another, he says "we have all our accounts posted and settled as far as practicable without your accounts *against the yard.*" In a letter to Mr. Clinch, he asks *to*

be furnished with a list of Mr. Eckford's *payments* and *charges ;* and in another letter to Clinch, he says there was a number of *articles furnished* for the use of the concern by Mr. E. of which he never has had an account from E. ; *and if he had those accounts there would be no difficulty in bringing the whole matter to a close forthwith.*

In the two last letters, there are expressions which favor the claim that all the moneys for which he drew on E., were disbursed on joint account. But it appears to me that these are of no force, on looking at this prominent assertion so often repeated, that Beacham required nothing but an account of Eckford's disbursements to balance their books, and close the whole matter. This seems utterly irreconcileable with the position that B. was interested in the outfit. He asks for no account of Eckford's receipts from Rebello, an account, without which the matter never could be closed, if the outfit were to be brought in. There was nothing on the books at Baltimore to show what E. had received for the outfit and armament. It is not pretended that B. knew any thing about it.

Yet he asseverates over and over, that if E. or his executors will send him a statement of moneys paid, he will adjust the books at once and close the whole.

He could not do what he alleged, if the outfit were any part of the joint concern. He could do it with ease, if it were not. In the matters of conceded joint account, Eckford had received but a single sum, the $350,000, stipulated for the frigate at the outset, and Beacham needed no statement or account of that great item, to enable him to make a settlement.

Upon the whole, I do not think that by the terms of the copartnership agreement, Beacham was to be interested in the outfit or armament for the frigate. In looking to the practical construction of the parties under the agreement, I find that it confirms that opinion. And the evidence does not satisfy me, that the parties ever expected or intended, either in view of the written agreement, or without regard to it, that Beacham was to be interested in the outfit or armament.

Eckford was the contractor for it in his own name. The burthen of proving an interest in Beacham lies upon the complain-

ants; and although it is with great diffidence that I differ from the accomplished and experienced master who made the report, my judgment is clear that they have not sustained their claim in regard to the outfit.

The first exception is therefore allowed.

(The court next investigated the exception relative to the payment of $12,000 for bonding the frigate, and decided that it was well taken, and that Beacham was not entitled to participate in that sum with Eckford.

The opinion then proceeded.)

The third exception is to the allowance of interest by the master on the balance found due from Eckford. After deducting the outfit account and all *extras*, it appears that there was $27,494 77 due from Eckford to Beacham, on the 6th of November, 1830, the date fixed upon as the termination of the copartnership. A sum which was unquestionably of great moment to Beacham, however inconsiderable it may have appeared to Mr. Eckford in his gigantic enterprises.

The master has charged his estate with interest from the time of the dissolution.

The question is one of much difficulty as well as importance, and the right disposition of it has caused me no small degree of anxiety.

The books to which I was referred, do not furnish anything decisive.

Mr. Collyer says, that in the cases where interest is decreed, the partner paying it is considered in equity as a trustee for the copartnership. (Colly. on Part. B. 2, ch. 3, § 4, art. 11.)

The principles applicable to trustees would afford a plain guide, but I apprehend that other considerations affect most of the cases. In *Crawshay* v. *Collins*, 15 Ves. 218, which was cited by Chancellor Kent in the case of *Stoughton and Lynch*, the continuing partners had used the bankrupt's share in their trade, and the decree was for an account and inquiry whether they had made any and what profits thereby. It was not a case of interest.

In *Stoughton* v. *Lynch*, 1 J. C. R. 467, and 2 ibid. 209, there

was a covenant that neither partner should withdraw any capital *or profits*, except as might be necesary for private expenses, but they were to be employed for the benefit of the concern. The defendant having withdrawn a large sum, which he claimed for expenses, (of which $10,000 and upwards was rejected by the court as not *necessary* expenses ;) he was charged with interest on such excess. In stating the account, the master after charging such interest, made a rest at the date of the dissolution.

Chancellor Kent, in 1 J. C. R. 467, declared that the defendant should pay interest on all the moneys withdrawn by him beyond his necessary private expenses. When the case came before him again, in 2 J. C. R., there was an exception taken by the defendant to the rest made by the master, and upon that exception the Chancellor observes : " The time of the dissolution of the partnership, was, undoubtedly, the proper period to adjust the balance, and the party who was then the debtor, became so with obligation to pay, and is therefore, justly chargeable with interest on such debt. It would seem to me very unreasonable, that the balance then truly due, should be retained in his hands down to this day, free of all interest. I apprehend that this is the general practice, as well as the good sense of the thing, that a rest should be made on the liquidation and adjustment of accounts, at the period of the first dissolution of the concern."

An *opinion* merely of the learned Chancellor, I should regard with profound respect. The weight of an authority is claimed for the proposition which I have quoted, and this is denied on the other side. The report of the case is somewhat obscure in reference to this point. If the withdrawals of the defendant from the assets of the firm on which he had been subjected to interest, when the suit was first before the Chancellor, were equal to or exceeded the balance due from him at the date of the dissolution in 1795 ; it would have been perfectly right to make a rest then, because those withdrawals commenced in 1783, and were very large in the two following years. The report shows that when the account was taken under the Chancellor's first decision in 1 J. C. R., there was a strenuous effort to charge the defendant with compound interest, on the moneys he had withdrawn. The

master refused thus to state the account, and instead of it, he made one rest between 1784 and 1816. This was at the date of the dissolution, but whether because that was the ordinary practice, or because it was just in that particular case, the report does not disclose. I infer the latter, from the fact that compound interest was claimed. And in that event, the opinion of Chancellor Kent affirming his decision, would not carry with it the great weight of his authority in favor of the principle claimed, as being the sole ground of his decree. The master in that case reported due on the 13th May, 1816, $22,216. This sum included nearly twenty-one years interest after the period of the rest made in the account, and on that assumption, the balance in 1795, was considerably less than the defendant's withdrawals from the firm which the Chancellor rejected; to say nothing of such as are not stated in the report of the case. This strongly corroborates the conclusion that the master acted upon the peculiar circumstances. I am therefore induced to believe, that *Stoughton* v. *Lynch*, is not a full decision that the period of dissolution, as a general rule, is to be the time from which interest is to be computed upon the balance subsequenly found to be due from one partner to the other.

In *Consequa* v. *Fanning*, 3 J. C. R. 587, 601, which was the case of a factor, Chancellor Kent said, "Unsettled accounts do not bear interest as of course, until liquidation."

The same thing was decided in our highest court, in the *Rensselaer Glass Factory* v. *Reid*, 5 Cowen's R. 587, as to unliquidated accounts generally, excepting items of cash advanced.

In *Waggoner* v. *Gray's Administrators*, 2 Hen. & Mun. 603, the Court of Appeals in Virginia, in a partnership case, decided that interest ought not to be allowed on an unliquidated account.

In *Dexter* v. *Arnold*, 3 Mason's R. 284, Mr. Justice Story, said "interest is not allowed upon partnership accounts generally, until after a balance is struck on a settlement between the partners; unless the parties have otherwise agreed or acted in their partnership concerns." In that case the bill was for an account by the representatives of a deceased partner, against the survivor, who was also the administrator of the deceased. They

surcharged and falsified the account stated by the survivor, and they claimed to charge him with interest on the amount of the errors ascertained.   The court said there was no evidence of intentional error, and that no general interest account was ever contemplated between the partners; and they held that there was no ground for the allowance of interest before the errors were ascertained.   In his Commentaries on the Law of Partnership, the learned judge does not treat upon this subject. (Story on Part. 499, § 349, note 2.)

On the other hand, in *Simpson* v. *Felts*, 1 McCord's Ch. R. 213, where the court below had refused interest, saying that there had been several ineffectual attempts to compromise, and it did not then appear in what amount, if any, the defendant was indebted to the complainant; the Court of Appeals of South Carolina, reversed the decree.   Judge Nott in delivering their opinion, said that the rule in their state is, where one man has retained the money of another, to presume he kept it for the purpose of profit, and therefore he must pay interest on it.   The balance due by the defendant is so much of the funds of the firm retained by him to which he was not entitled, and for the use of which he ought therefore to pay interest.

In *Bowling's Heirs* v. *Dobyn's Administrators*, 5 Dana's R. 434, Bowling and Dobyn had been partners as drovers, and B. had received the whole effects.   By his own admission before the suit, he owed over $1600, which he failed to pay.   The decree declared that there was $1682 due from him, and it allowed interest from the time of filing the bill.   This allowance was excepted to, but it was sustained on appeal.

In *Honore* v. *Colmesnil*, 7 ibid. 199, there was an intricate and protracted copartnership controversy.   H. had furnished almost all the capital.   C. was the bookeeper of the concern, and at the dissolution owed a large balance to H.   In the accounting, H. claimed interest on the excess of his capital from the time it was put in.   This was disallowed; but the court charged C. with interest from the date of the dissolution, on the balance then due from him, although it was only ascertained by the result of the suit.   The court say, that if in any case, interest is not to be allowed, because at the dissolution the accounts are unliquidated, it

will not be so where the debtor partner was the book-keeper, and was bound to know the state of the accounts and the extent of his own indebtedness.

This statement of the authorities shows that there is no general rule which is applicable to this case, and on which I can rest, to fix the date of the dissolution as the period from whence interest is to be computed.

The case of *Stoughton* v. *Lynch*, I am satisfied should not be regarded as *a decision*, establishing a general rule; and the opinion of the revered Chancellor on this point, is met by the contrary opinion of another eminent jurist in *Dexter* v. *Arnold*, as well as the general principle in regard to interest on unliqui-dated accounts as settled in the *Rensselaer Glass Factory* v. *Reid.*

The South Carolina decision, is in effect opposed to that in Virginia, and to *Bowling* v. *Dobyn*, in Kentucky, and the prin-ciple there asserted by Judge Nott, as the ground for imposing in-terest, is not the law here.

And *Honore* v. *Colmesnil*, which was so much relied upon by the complainant's counsel, was decided upon its peculiar facts. The most prominent feature in that case, and the one which was decisive as to the allowance of interest, was the fact that the de-faulting party was the one who kept the books, and was thus chargeable with actual knowledge of the precise state of their af-fairs ; a fact which does not exist in this case.

I am convinced that the allowance or refusal of interest in partnership accounts must, in a great measure, depend upon the application of various legal principles to the circumstances of each case.

In the event of such a conclusion, the complainants claim that the master's decision should be sustained on the circumstances proved in evidence, independent of the force of the adjudged cases.

1. It is said that the copartnership agreement calls for this charge of interest.

I understand it otherwise. It is a part of the paragraph in which Eckford agrees to advance the money for carrying on the business of the ship-yard, and which provides that the moneys

received are to be placed to his credit. It concludes with these words, "and an interest account to be kept between *him* and the concern." This clause clearly refers to Eckford's cash advances, which were likely to be heavy in the first instance, and to the cash payments from which he was to be re-imbursed. It is not applicable to the general concerns of the partnership. The master did not allow the interest in pursuance of the contract, as is obvious from his report.

2. It is claimed on the ground that Eckford was aware in 1827, of the large balance due to Beacham, and he ought to have paid it then, or at least at the dissolution.

I think it is indisputable that Eckford knew when he received Hazel's letter, of July 21, 1827, that Beacham in their settlement would be entitled to a large sum for his proportion of the profits on building the frigate. His own ledger, with Hazel's letter, would have showed him that general result. I do not understand whether the balance then stated by Hazel, from the Baltimore books, was vitiated by the extensive errors which subsequently appeared on dissecting the book made by the accountant Smith. Assuming that it was not erroneous, it did not, however, apprise Eckford of the precise balance as it then stood between him and B.

There was no direct obligation upon E. to pay over to B. at that time, even if the balance were known.

Then how was it when the obligation to account and pay became operative on both Beacham and Eckford, by the dissolution ?

The information which Eckford had in 1827, would be no criterion for the state of affairs in 1830 ; the ship-yard having been in active operation during the whole interval, without E.'s receiving anything from it.

Eckford might reasonably infer, what the accounting has proved, that he had received considerable more than his share of the profits of the whole concern ; but it was not in his power to know or ascertain, without having Beacham's accounts. It was the duty of each partner at that time to furnish to the other all their accounts, and to endeavor to adjust them, and it was the

duty of the debtor to pay the balance thus ascertained. It was especially the duty of Beacham to render an account, because the great mass of the transactions of the firm were entered in his books, while only a small portion of them appeared in the books of Eckford.

I have not a doubt but that if Beacham had discharged his duty in this respect, Eckford would have been chargeable with interest from the date of the dissolution, and I would most cheerfully have enforced that liability.

But what was the course of Beacham?· It appears by the letter of Hazel before mentioned, that as early as July, 1827, Eckford had applied to Beacham, or to Hazel as the accountant in his immediate charge, for the account of B.'s expenditures on the frigate; the great business of their firm up to that time; and that it could not be furnished, because of the manner in which the stock in the ship-yard had been used. All that he obtained were the gross footings of Beacham's own account.

Beacham's letter of October 10, 1828, shows that there had as yet been no statement furnished to Eckford, and in another letter of October 29, 1828, he says he will send copies of all the accounts from the books. He never did transmit the statements or copies. He was advised not to do so, till he obtained Eckford's account, and he was incessant in his requests to E. to furnish such accounts.

He had done nothing prior to the dissolution, which would enable Eckford to strike the balance.

After that event, there was no change until Eckford's death. Then a more imperative duty devolved upon Beacham, as the surviving partner, to adjust the accounts and ascertain the balance. Still he placed nothing in the hands of E.'s representatives, but persisted in calling for E.'s accounts, and in drawing the settlement to Baltimore.

In 1834 or 1835, the assignees of Beacham procured the witness Smith, to make up the accounts from B.'s books, and he prepared the *Book C.* 2; which in the progress of this suit was shown to be erroneous in favor of Beacham to the amount of nearly $11,000.

On this book, the suit was instituted, and it was not till June

29, 1837, when Hazel had re-examined Beacham's accounts, and made up the *Book B. V.*, that the true state of those accounts was for the first time brought to the knowledge of Eckford's executors.

It is an undeniable fact that Eckford himself was in his lifetime, equally remiss on his part. To Beacham's repeated applications for his accounts, he was negligent, or indisposed to accede. And no account was furnished to Beacham, prior to the answer of his executors in this cause. If perchance the balance had resulted in their favor, this negligence would have operated against them on the question of interest.

But after an anxious consideration of the subject, I cannot visit upon the estate of Eckford, in favor of Beacham, as an offence, a neglect of which the latter is as guilty as the former. I look upon the long delay in settling the accounts as the fault of both parties, and so far as I can judge, the one is as culpable as the other.

By reason of this mutual omission and neglect, no balance was ascertained or known; and there was no default in paying, because there was no fixed sum to pay. There was in truth a large balance which ought to have been paid to B. in 1830, but which could not be adjusted without his account, nor even definitely known. He should have furnished that account, in order to put Eckford in default; but having omitted that duty, he cannot equitably complain that E. did not perform his corresponding duty, and pay the sum really due.

On Hazel's production of the *Book B. V.*, in June, 1837, the defendants first had the information which put them in default in reference to the balance due to Beacham. With the aid of their own books, the state of the accounts was then opened to them; and from that time they are justly chargeable with interest. It is true, this suit was then in active progress; but the amount or probable amount could have been paid into court, and made productive to the complainants, or at once paid out to them.

It is quite rigid to insist that a party shall pay interest the moment that he is possessed of the means of knowing how much principal he ought to pay; but under the peculiar circumstances

,of this case, I feel impelled to hold the defendants to that strict-ness.

The third exception is allowed to the extent of the interest prior to June 29, 1837.

As to the costs of the suit, they must be borne by the respective parties. Both have been in default. Besides that, the account has been intricate and doubtful, and there has been a successful defence to a large portion of the demand.